### THE MAYFLOWER.

ULLERY et al. v. THE MAYFLOWER.

(District Court, W. D. Pennsylvania. August 3, 1896.)

1. SHIPPING—TITLE TO VESSEL—ESTOPPEL.

A limited partnership purchasing a steamboat covenanted to reconvey her to the vendors in case of any default, existing for a specified time, in the payment of purchase-money installments. Defaults were made for longer than the time fixed, and thereafter the boat was reconveyed by a bill of sale executed in behalf of the company by persons signing themselves as chairman, secretary, and general manager, and attested by the company's seal. The vendees then conveyed to a third person, as trustee. Subsequently members of the limited partnership libeled the vessel for claims for services, alleging her to be the property of the said trustee. *Held*, that in view of this averment, and of the fact that the persons executing the reconveyance only did what the company had covenanted to do, the libelants could not assert that the reconveyance was made without authority, and did not pass the title.

**2.** MARITIME LIENS—SERVICES.

> Members of a limited partnership, which has conveyed a vessel to third parties by bill of sale with covenant of general warranty, cannot thereafter assert a lien against her for services performed while she was owned by the partnership.

Geo. W. Acklin, for libelants.

S. C. McCandless, for respondents.

BUFFINGTON, District Judge.    W. H. Ullery and others file this libel against the steamboat Mayflower for services rendered on said vessel.    The facts of the case are as follows:    On April 19, 1894, W. H. Wilson, Frank A. Bailey, Thomas M. Reese, and J. B. Sneathen, owners of the Mayflower, by an article of agreement signed by them on their own behalf and for the Mendelsohn Park Excursion & Amusement Company, Limited, by L. N. Clark, chairman, and Thomas A. Ingram, secretary, and sealed with the company seal, agreed to sell said vessel to said co-partnership for $15,000. One thousand dollars of this sum was to be paid in hand, and the balance secured by a marine mortgage. This mortgage was given and recorded. By this agreement the Mendelsohn Company covenanted "to pay all bills, wages, and claims contracted for, on account of, or charged to, said boat, once each week," and also that, "in default of any payment of interest or principal for a period of five (5) days after the same is due and payable by the terms hereof, or the violation of any single condition, covenant, or agreement to be done and performed by said second party, then the right and privilege is granted to said parties of the first part by the party of the second part to resume possession, control, and ownership of said boat without resort to legal process to obtain possession and ownership; and said party of the second part further agrees to execute a bill of sale retransferring said boat to said first parties for a breach of any one of said covenants, conditions, or agreements, or default in paying interest or principal; or, if said first parties proceed on their mortgage to recover possession, then said second party agrees to file no defense or claim for any part of said consideration which may have been paid." The purchase money was not paid as it matured, but the company was allowed to run the boat until May 29, 1895. At this time considerable amounts of wages, extending far over the week contemplated in the agreement, were in arrear. On that day the boat was reconveyed by bill of sale to the original owners. This bill of sale was executed on behalf of the company by Lewis N. Clark, who signed as chairman and manager, and by George H. Lynch, one of libelants, who signed as secretary and manager. The company seal was attached, and the instrument regularly acknowledged on June 3, 1895, and recorded the same day in the office of the surveyor of customs. It contained a clause of general warranty by which the Mendelsohn Company agreed "to warrant and defend the steamboat or vessel called the Mayflower, and all other before-mentioned appurtenances, against all and every person or persons whomsoever." The vendee under this bill of sale took possession of the boat, and sold her thereafter to James H. Reese, trustee, by agreement of sale with clause of warranty. Subsequent to

said sale this libel was filed to recover for services rendered during the time the vessel was operated by the Mendelsohn Company. In the libel James H. Reese, trustee, is expressly alleged to be her owner. He appeared, gave bond, procured the vessel's release, and removed her from the jurisdiction of the court. Subsequent to the filing of the libel the claims of all the libelants except four were paid. The costs were not paid, and thereafter the case was proceeded in as to W. H. Ullery, who claimed $98.23 for services as mate; George F. Dumbarger, who claimed $459 for services as engineer; Thomas F. Dunlevy, who claimed $80 for services as pilot; George H. Lynch, who claimed $60.12 for services as clerk. The four claims were contested on the ground that libelants, being members of the limited partnership when they rendered their services and when the boat was sold, could not, under the facts of this case, maintain a lien against her.

The libelants contend the bill of sale by which the vessel was re-transferred to the original owners was not executed by the authority of the company, and did not convey the title to the boat. There is no evidence that Clark was not a manager and chairman of the company. Lynch swears he was not an officer. The paper shows that he signed it as one, and he does not deny the statement of Thomas M. Reese that he was represented as one at the time. There is no proof that the vendees under the bill of sale knew of his lack of authority. If, however, the paper was voidable on that account, libelants have taken no steps, nor has the company, to repudiate the acts of the persons executing it; and they have positively affirmed them by filing their libel against the vessel, and expressly recognizing and averring Reese to be the owner as we have seen. In addition thereto, it will be noted that by the instrument by which the company purchased the vessel, provision was made for the retransfer to the vendors in case of the nonpayment of the purchase money. Whether authorized or not, the persons signing, and who were in charge of the boat, seem to have done no more than the company was obligated to do. For present purposes we must regard the vessel as having been properly retransferred to the original owners, and by them to James H. Reese. Under these facts, can the libelants maintain their liens? After careful examination, we are of opinion they cannot. What might have been the rights of these libelants as against a limited partnership, of which they were members, to acquire a lien, is not the question before us, and upon it we express no opinion. Here the rights of third parties had intervened. In the very instrument by which alone the company acquired any claim to the boat, it covenanted to pay all wages contracted for or charged to the boat once each week. Will a court, proceeding on equitable principles, permit members of that partnership, in violation of the company's covenant, to fasten upon the vessel, as against these covenantees, a liability extending over months? The very statement of the facts is a refutation of the claim. But this case goes further. When the vessel was reconveyed to the original vendors for nonpayment of the purchase money, as provided in the instrument by which the company originally took title, a covenant of general warranty was given. Certain-

ly this case comes within the spirit of what Mr. Justice Grier said in Gallatin v. The Pilot, 2 Wall. Jr. 592, Fed. Cas. No. 5,199:

"A sale by the sheriff confers all the title which the defendants in the execution have, and is equivalent to their own deed with special warranty. The case, then, presents this bare proposition: Can a vendor, for a consideration paid, retain a lien against property which he has thus sold and delivered, in the hands of his vendee; and that, too, for a debt due by himself to himself? Certainly he cannot, for where a chattel is sold and delivered to the vendee, the vendor has neither jus in re nor ad rem; neither property in or lien on the thing sold. Admitting there was, as between the partners, a balance in favor of the libelants, and that it would have been a lien inter sese, how could we retain such a lien on a boat sold by themselves with special warranty?"

In the present case the purchasers of the boat from the company were mortgage creditors, and, while the transaction was in form a sale, in substance its purpose was to extinguish and wipe out the mortgage debt. This debt was in existence before libelants' services were performed. Both by its record and its recital in the conveyance of the vessel, the members of the company had notice of its existence before they performed any part of the work sued for in this libel. Such being the case, it would be inequitable to permit the partners, as individuals, to wipe out the mortgage, or acquire a lien prior to it for services subsequently performed. In addition to this, it is to be noted that the facts of this case tend to show the work was done on the faith of the partnership, rather than on the security of the boat. Libelants had notice that the boat itself was heavily in debt, and must have realized that with the large mortgage upon her they must rely, not on the mortgaged boat, but on the successful operation of the partnership for payment of their wages. On the whole, we are of opinion the work was not done on the credit of the boat, and on this account, if other reasons were necessary, the libel could not be sustained. The St. Joseph, Fed. Cas. No. 12.229, Brown, Adm. 202; The Benton, Fed. Cas. No. 1,334. The libel was confessedly proper as to some of the libelants who were afterwards paid, and would have carried costs. Under the circumstances, a decree will be entered against the respondents for costs.